Filed 6/30/26  Ramsey v. State Personnel Board CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)


| | |
|---|---|
| BENJAMIN RAMSEY,<br>        Plaintiff and Appellant,<br><br>        v.<br><br>STATE PERSONNEL BOARD,<br>        Defendant and Respondent;<br><br>DEPARTMENT OF CORRECTIONS AND<br>REHABILITATION,<br>        Real Party in Interest and Respondent. | C103766<br><br>(Super. Ct. No. 23WM000035) |


The Department of Corrections and Rehabilitation (the Department) terminated Benjamin Ramsey's employment as a correctional officer for slapping an employee from another agency during an off-duty training session and lying about the incident in a subsequent investigation.  Ramsey appealed the termination to the State Personnel Board (the Board).  An administrative law judge (ALJ) held an evidentiary hearing and found Ramsey's conduct constituted inexcusable neglect of duty, insubordination, dishonesty, willful disobedience, and other failure of good behavior, which justified the dismissal. The Board adopted the ALJ's proposed decision.

Ramsey sought judicial review of the Board's decision by filing a petition for writ of mandate in the trial court.  The trial court denied the petition.  Ramsey appeals,

1

arguing the trial court should have independently reviewed the ALJ's findings and would have set aside the termination had it done so. Ramsey's arguments lack merit. Accordingly, we will affirm the judgment.

## I. BACKGROUND

*A.     Ramsey's Time in the Reserve Officer Training Corps*

Ramsey matriculated at Weber State University in Ogden, Utah in 1998. He joined the Reserve Officer Training Corps (ROTC) on campus and participated in the program throughout his freshman year, from August 1998 through March 1999. During that time, Ramsey was an active reservist in the United States Army Reserve, which meant he could be called for military service should the need arise.

Ramsey took a two-year leave of absence from Weber State University and ROTC to participate in a religious mission at the end of his freshman year. Upon returning from his mission, in 2001, Ramsey received a medical discharge from the United States Department of the Army for post-traumatic stress disorder, hypoglycemia, and depression. As a result, Ramsey was disenrolled from the ROTC program and discharged from the United States Army Reserve.

*B.     Ramsey's Employment Application for the Department*

Ramsey submitted an employment application to work for the Department in 2004. As relevant here, the application form asked: "Have you ever served in any Armed Forces, National Guard, or military reserves?" Ramsey wrote: "D.N.A.," an acronym for "does not apply." He responded the same way to other questions about military service, including one that asked whether he had received a medical discharge from the military. He certified under penalty of perjury that all such responses were true and correct. Ramsey became a correctional officer in 2005. He was promoted to the position of correctional sergeant in 2012.

2

*C.     The Training Incident*

Ramsey became friends with E.H., a National Park Service ranger, through their church. They shared an interest in self-defense techniques and training, and sometimes they practiced together after fulfilling their religious obligations. They also offered self-defense instruction to young people from their church.

In early 2021, E.H.'s supervisor asked her to organize a self-defense training session for her fellow rangers. E.H. thought of Ramsey and told her supervisor she knew someone from the Department who could provide self-defense instruction to rangers. E.H.'s supervisor agreed to Ramsey's involvement, and E.H. sent an email letting rangers know the session would take place on April 29, 2021, at the National Park Service office in Crescent City.

Two rangers attended the class, E.H. and J.L. J.L. was new to the National Park Service, having joined some six months earlier. She understood from E.H. that Ramsey worked at Pelican Bay State Prison. She also understood that Ramsey was friends with E.H., someone she liked and respected.

J.L. arrived late that morning and began working with Ramsey. They practiced "ground escapes," which are techniques for escaping from a defensive position on the ground. One ground escape scenario began with J.L. lying on her back, with Ramsey straddling her chest. J.L. employed a bucking maneuver to dislodge Ramsey. She managed to turn the tables on Ramsey, so she was now straddling him. J.L. started moving towards Ramsey's head to gain control of him. As she moved forward, Ramsey slapped J.L.'s genital area with an open hand. J.L. jumped up and exclaimed, "My vagina!" She looked at Ramsey, who smirked at her. An uncomfortable silence followed. J.L. laughed to break the silence and Ramsey said, "It's a sensitive area no matter what gender you are." The training session resumed.

J.L. and E.H. communicated afterward. J.L. told E.H. that she enjoyed the training session, but she was surprised by the "vag slap." It was only then that E.H. understood

3

what happened.  E.H. had heard J.L. cry out, and Ramsey say, "It's a sensitive area no matter what gender you are."  But she had not seen the slap and had not previously understood that Ramsey slapped J.L. in the genital area.  E.H. encouraged J.L. to report the incident, and J.L. did so.  Federal and state investigations ensued.

D.      *Investigatory Interviews*

Ramsey was interviewed by investigators for the National Park Service in May 2021.  Ramsey told the investigators that he served in the Army from 1998 through 2001, when he was medically discharged due to an injury.[1]  He said he learned self-defense in the Army, and took online courses from an organization that offered "the closest thing [he'd] been able to find to what [he] learned in the [A]rmy."

Ramsey acknowledged making contact with J.L.'s genital area during the training session.  However, he said the contact occurred while they were practicing a "bear hug escape," a standing self-defense technique used to break free from an attacker who comes from behind and wraps their arms around the victim's torso.  According to Ramsey, the bear hug escape scenario began with J.L. standing behind him with her arms wrapped around his torso.  Ramsey shifted his weight to one side and swung an arm back in an attempt to break free.  It was then, Ramsey said, that he accidentally made contact with J.L.'s genital area with his hand.  Ramsey described the contact as a "light tap" and insisted that it was accidental.

Ramsey was interviewed by special agents from the Department's Office of Internal Affairs in September 2021.  Ramsey told the agents he learned self-defense techniques at the parole and correctional officer training academies and received yearly training on use of force and baton use, which he supplemented with online courses.  He also said he served in the military and received informal training in self-defense from

---

[1] Ramsey later acknowledged his medical discharge papers said post-traumatic stress order and hypoglycemia.

4

other members of his unit. Later, Ramsey clarified that he participated in ROTC from August 1998 through March 1999. As a participant in the ROTC program, Ramsey said he was also an active-duty member of the United States Army Reserve. Ramsey explained that he became an inactive member in order to complete his mission, and he received a medical discharge upon his return. Ramsey acknowledged denying military service on his employment application, and admitted the response was untruthful. When asked why he responded untruthfully, Ramsey said he was embarrassed about the circumstances surrounding his medical discharge.

Turning to the training session, Ramsey said he accidentally made contact with J.L.'s genital area while practicing a bear hug escape. He again characterized the contact as a "light tap" with the outside of the hand. He added that J.L. responded to the contact by jumping up and down and giggling, while saying, "my vagina, my vagina." As before, Ramsey maintained that the contact was accidental. Ramsey acknowledged practicing ground escapes with J.L., but denied any inappropriate contact during those exercises, accidental or otherwise.

E.      *Administrative Proceedings*

The Department served Ramsey with a notice of adverse action terminating his employment. The notice alleged Ramsey intentionally misrepresented his military service on his employment application, inappropriately touched J.L. during the training session, and made false statements in the Department's investigatory interview. The notice charged Ramsey with inexcusable neglect of duty, dishonesty, insubordination, willful disobedience, and other failure of good behavior under Government Code section 19572, subdivisions (d), (e), (f), (o), and (t).[2]

---

[2] Undesignated statutory references are to the Government Code.

Ramsey appealed the termination to the Board. An evidentiary hearing was held in January 2023. At the hearing, Ramsey testified that he considered himself to have served in the Army and held himself out as having done so to investigators, members of his church, and the Department. Nevertheless, he admitted to denying military service on his employment application. When asked why, Ramsey said he could not remember telling investigators he had been embarrassed about the circumstances surrounding his medical discharge and instead offered a new explanation; namely, that his commanding officer instructed him at the time of his discharge that he should deny military service in future employment applications. Ramsey acknowledged saying nothing about this alleged instruction in either investigatory interview. With respect to the training incident, Ramsey testified he accidentally made contact with J.L.'s genital area with the side of his hand while practicing a bear hug escape. Once again, Ramsey said J.L. responded by giggling and saying, "my vagina, my vagina."

J.L. remembered things differently. She testified that Ramsey slapped her while practicing a ground escape scenario. She said the slap was delivered with an open hand and was "hard and deliberate." J.L. remembered that she got up, and said, "my vagina." She then turned to look at Ramsey. Ramsey smirked at her but said nothing. An uncomfortable silence followed, and J.L. laughed to break the silence. The training session then resumed.

J.L. testified that Ramsey discussed his work for the Department during the training session. Ramsey described situations in which he made off color comments to prisoners—including allusions to sex and sexual assault —as a way of keeping them off balance and maintaining control over them. J.L. said she typically extends the benefit of the doubt to other law enforcement officers, but she found Ramsey's comment about sexually assaulting inmates was one of the "weirdest, most vulgar things [she had] ever heard ever in [her] several years doing law enforcement." All in all, J.L. believed the

6

slap was intentional, and Ramsey could not be trusted to wield power responsibly over incarcerated persons under his supervision.

E.H. testified she was standing nearby when Ramsey and J.L. practiced the ground escape scenario. She said she heard J.L. cry out and saw Ramsey's hand between her legs. She also said she heard Ramsey say, "something about, you know, it's a sensitive area no matter what gender you are." Looking back, E.H. was struck by the fact that Ramsey made that comment, rather than apologize for the supposedly accidental contact. Under the circumstances, E.H. also believed the slap was intentional.

The ALJ issued his proposed decision in February 2023. The proposed decision included an eight-page credibility determination using the criteria provided by Evidence Code section 780. (Evid. Code, § 780 [when evaluating credibility, the trier of fact may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of the [witness's] testimony," including witness demeanor; character of testimony; extent of the witness's ability to perceive, recollect or communicate any matter about which she or he testifies; the existence or nonexistence of bias, interest or motive; the existence or nonexistence of any fact testified to by the witness; and the witness's attitude toward the action or testimony"].) Generally speaking, the ALJ found that Ramsey was not credible. In the ALJ's opinion, Ramsey "appeared more interested in telling a particular story than in providing the requested information" and gave responses that "sounded more rehearsed than sincere." "This was particularly true," the ALJ said, when Ramsey "was offering testimony on key disputed matters."

With respect to the employment application, the ALJ emphasized Ramsey's inconsistent responses to questions about his military service. Although Ramsey held himself out as having served in the Army, he denied military service in the employment application. Years later, he acknowledged the denial was untruthful, adding that he was embarrassed by the circumstances surrounding his medical discharge. He stuck with that explanation throughout the investigatory interview and thereafter, even after reviewing

the transcript of the interview. It was only at the evidentiary hearing, over a year later, that Ramsey for the first time said his commanding officer instructed him to deny military service. The ALJ found it significant that Ramsey made no attempt to reconcile his inconsistent statements but instead said he did not remember acknowledging the untruthfulness of the denial in his interview.

Ramsey's shifting explanations might have given the ALJ reason enough to question his veracity, but the ALJ also found the alleged instruction to deny military service was "facially odd," given that Ramsey's contemporaneous discharge papers were on Department of the Army letterhead and said he was being discharged from the United States Army Reserve. Taking everything into consideration, the ALJ concluded Ramsey likely denied military service on his employment application because he was embarrassed by the circumstances surrounding his medical discharge, and not because his commanding officer instructed him to do so.

With respect to the training incident, the ALJ observed that J.L. and E.H. testified consistently with one another, and "presented as sincere." In the ALJ's words: "Each appeared to give thoughtful responses, and each was careful not to overstate when testifying. Neither exaggerated, neither showed any bias against [Ramsey], and both were ready to give [Ramsey] credit for positive aspects of their interactions." The ALJ rejected Ramsey's attempt to impeach J.L.'s credibility by suggesting she was biased against men. The ALJ was also unmoved by Ramsey's argument that J.L. supposedly "giggled" after the slap and so must not have been bothered by it. The ALJ noted that J.L. characterized her laughter as a response to an uncomfortable moment, and E.H. described it as "surprised." Neither testified to giggling, and the ALJ found not credible Ramsey's supposition that J.L. would "giggle and smile after being surprised by a painful slap to her vagina." By contrast, the ALJ found persuasive E.H.'s theory that someone who accidentally made contact with another's genital area could ordinarily be expected to apologize. In the ALJ's opinion, Ramsey's reaction was "more consistent with an

8

intentional action taken in order to escape the hold [J.L.] had on him." Accordingly, the ALJ credited J.L.'s testimony that Ramsey's conduct was intentional over Ramsey's testimony that it was all an accident.

When all was said and done, the ALJ sustained most of the charges as alleged, including that Ramsey made false statements on his employment application, intentionally slapped J.L.'s genital area during the training session, and made false statements about the slapping incident in the investigative interview. The ALJ also sustained the dismissal, finding Ramsey's misconduct was severe, intentional, and likely to repeat. The Board adopted the ALJ's proposed decision.

### F.     Trial Court Proceedings

Ramsey filed a petition for writ of mandate under Code of Civil Procedure section 1094.5. The Department opposed the petition. The trial court issued a tentative ruling denying the petition. Following argument, the trial court affirmed the tentative ruling and entered judgment in favor of the Department and the Board. This appeal timely followed.

## II.  DISCUSSION

Ramsey advances three arguments on appeal. First, he argues the trial court applied the wrong standard of review in ruling on the petition. Second, he argues the ALJ's findings were not supported by substantial evidence. Third, he argues the trial court erred in upholding the penalty of dismissal. These arguments fall flat.

### A.     Standard of Review

The Board is the state agency vested with authority to review disciplinary actions taken against public employees. (*Thaxton v. State Personnel Bd.* (2016) 5 Cal.App.5th 681, 691.) In conducting that review, the Board acts in an adjudicatory capacity under powers granted by the California Constitution. (*Ibid.*) As such, the Board acts much as a trial court would in an ordinary judicial proceeding; it makes factual findings and exercises discretion on matters within its jurisdiction. (*Ibid.*)

9

The Board's decision may be reviewed by the superior court by way of a petition for writ of administrative mandamus. (Code Civ Proc., § 1094.5, subd. (a).) The trial court reviews the Board's findings for substantial evidence, considering all relevant evidence in the administrative record including evidence that fairly detracts from the evidence supporting the Board's findings. (*Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 281 (*Cate*).) Our review is the same as that of the trial court; we independently determine whether substantial evidence supports the Board's findings, not the trial court's conclusions. (*Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487 (*Telish*); *Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 742.)

" 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] Such evidence must be reasonable, credible, and of solid value." (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584-585 (*California Youth Authority*).) In applying the substantial evidence test, " ' "[w]e do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of [the Board's] decision. Its findings come before us 'with a strong presumption as to their correctness and regularity.' [Citation.] We do not substitute our own judgment if [the Board's] decision ' " 'is one which could have been made by reasonable people….' " ' " ' " (*Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 851 (*Palmieri*).) The appellant bears the burden of demonstrating that the Board's findings are not supported by substantial evidence. (*Telish, supra*, 234 Cal.App.4th at p. 1497.)

The penalty imposed by the Board is reviewed for abuse of discretion. (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 217; *County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877 (*County of Los Angeles*).) We will not disturb the Board's choice of penalty unless the Board " 'patently abused its exercise of discretion by acting arbitrarily, capriciously, or beyond the bounds of reason.' " (*Cate, supra*, 204 Cal.App.4th at p. 284; see also *County of Los Angeles,*

*supra*, at p. 877 [the penalty imposed must be upheld if there is any reasonable basis to sustain it].) " 'It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.' " (*Bautista v. County of Los Angeles* (2010) 190 Cal.App.4th 869, 879.)

In considering whether an abuse of discretion has occurred in the context of public employee discipline, " 'the overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence.' [Citation.] The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability." (*County of Santa Cruz v. Civil Service Commission of Santa Cruz* (2009) 171 Cal.App.4th 1577, 1582; see also *County of Siskiyou v. State Personnel Bd.* (2010) 188 Cal.App.4th 1606, 1615.) In weighing such factors, the nature of the employee's profession must be considered, "because 'some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields.' " (*County of Los Angeles, supra*, 40 Cal.App.5th at p. 878 ["Peace officers . . . are held to higher standards of conduct than civilian employees, and dishonesty by law enforcement personnel is considered to be highly injurious to their employing agencies"].)

B.      *Whether the Trial Court Applied the Wrong Standard of Review*

Ramsey argues the trial court applied the wrong standard of review in ruling on the petition. He argues the trial court was required to exercise its independent judgment on the evidence before the Board, because the Board's decision affected his fundamental vested right in employment. Ramsey is wrong.

As previously discussed, the Board is a statewide administrative agency to which the California Constitution grants adjudicatory power to review disciplinary actions taken against state civil service employees. (Cal. Const., art. VII, § 3; *California Youth*

*Authority, supra*, 104 Cal.App.4th at p. 584.) "Because the State Personnel Board derives its adjudicatory authority from the state Constitution rather than from a legislative enactment, a superior court considering a petition for administrative mandate must defer to the board's factual findings if they are supported by substantial evidence." (*State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 522.) The Board's factual determinations are not subject to independent review by the trial court even if fundamental vested rights are involved. (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 ["Decisions of the State Personnel Board, an agency of constitutional authority [citation], are reviewed only to determine whether substantial evidence supports the determination, even when vested rights are involved"]; *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35 ["the court's scrutiny of the [constitutional] agency's factual findings is limited to a determination whether those findings are supported by substantial evidence in light of the whole record—and this is so *whether or not* the decision of the agency affects a fundamental vested right"].) The trial court thus properly reviewed the Board's findings for substantial evidence.

Ramsey's confusion concerning the applicable standard of review permeates every other argument in his opening brief. Throughout the brief, Ramsey argues the trial court erroneously deferred to the Board and would have reached different conclusions had it reviewed the evidence independently. These arguments are also wrongheaded, as Ramsey concedes by abandoning them on reply.

" 'When an appellant fails to apply the appropriate standard of review, the argument lacks legal force,' and the appellant 'fails to show error in the judgment.' " (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 597.) Ramsey fails to tailor any of the arguments in his opening brief to the appropriate standard of review and thus fails to demonstrate error. (*Id.* at p. 598 [an appellant "does not meet its burden to show error on appeal when it fails to tailor its arguments and,

indeed, seemingly ignores, the appropriate standard of review"].)  And, though Ramsey tries to recalibrate his arguments in his reply brief, he still fails to understand or apply the substantial evidence standard of review, as we next explain.

## C.       *Whether Substantial Evidence Supports the ALJ's Findings*

Ramsey raises three principal challenges to the sufficiency of the evidence.  First, he argues there was insufficient evidence of the required nexus between his conduct in the off-duty training session and his employment as a correctional officer.  Second, he argues there was insufficient evidence to support the finding that the slap was intentional.  Third, he argues there was insufficient evidence he acted dishonestly in filling out his employment application and describing J.L.'s reaction to the slap.  None of these arguments has any merit whatsoever.

### 1.       *Sufficiency of Evidence of Nexus*

Section 19572, subdivision (t) authorizes discipline for "[o]ther failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment."  The subdivision requires "more than failure of good behavior."  (*Warren v. State Personnel Bd.* (1979) 94 Cal.App.3d 95, 104.)  It also requires that the misconduct "be of such a nature as to reflect upon the employee's job."  (*Yancey v. State Personnel Bd.* (1985) 167 Cal.App.3d 478, 483; accord *Stanton v. State Personnel Board* (1980) 105 Cal.App.3d 729, 739-740.)  That is, the misconduct "must bear some rational relationship to [the person's] employment and must be of such character that it can easily result in the impairment or disruption of the public service."  (*Warren, supra*, at p. 104; see also *Johnson v. County of Santa Clara* (1973) 31 Cal.App.3d 26, 32.)  [" 'If the misconduct bears some rational relationship to the employment and is of a character that can reasonably result in the impairment or disruption of public service,' the employee may be disciplined"].)

Ramsey argues the trial court erred in finding a nexus between the training incident and his employment.  He emphasizes that the training session was an off-duty,

13

volunteer activity that occurred outside of any Department facility and involved participants having no connection to the Department. He also emphasizes that he informed E.H. and J.L. at the outset that he was not certified by the Department to teach self-defense tactics. These arguments are misguided.

As we have said, we are concerned with the Board's findings, not the trial court's conclusions. (*Telish, supra*, 234 Cal.App.4th at p. 1487 [" 'an appellate court independently determines whether substantial evidence supports *the SPB's findings*, not the trial court's conclusions' "].) Ramsey's sights are thus set on the wrong target. But even assuming Ramsey had taken aim at the Board's nexus finding, he would still miss the mark.

The ALJ found Ramsey's conduct was rationally related to his employment because E.H. and the National Park Service asked him to lead the training session "based, in part, on the fact that he worked for [the Department]." We need not decide whether that finding would be enough on its own to establish the required nexus, because there was additional evidence connecting Ramsey's misconduct to his employment as a correctional officer.

The administrative record reveals that Ramsey held himself out as someone with specialized knowledge of self-defense, gained from his military service *and* work for the Department. Ramsey told investigators he originally learned self-defense tactics in the Army, which he subsequently modified for use in prison. He similarly told E.H. and J.L. that he learned unconventional self-defense techniques so he could use them at work, should the need arise.

During the training session, Ramsey discussed something called an "OODA loop," which describes stages of the decision-making process. [3] Ramsey explained that

---

[3] "OODA" is an acronym for "[o]bserve, [o]rient, [d]ecide[,] and [a]ct."

14

incarcerated persons often say and do unexpected things to disrupt a correctional officer's OODA loop and throw them off-balance. Ramsey observed that the same technique could be used on incarcerated persons or suspects. For example, Ramsey said he sometimes refers to anal penetration in brushes with inmates as a way of disrupting their OODA loops and getting them to "knock it off." J.L. recalled that Ramsey demonstrated the technique on at least one occasion during the training session. Ramsey and J.L. were practicing a knife defense scenario, with one playing the role of law enforcement officer and the other playing the role of the suspect.[4] As they struggled, J.L. said, "Fuck you." Ramsey replied, "when and where baby?" When the knife defense scenario was over, Ramsey explained that he made the off-color remark to break J.L.'s OODA loop. This was essentially the same tactic he described using with inmates.

Viewing the record as a whole, we are satisfied that substantial evidence supports the Board's nexus finding. Ramsey presented himself as someone with specialized knowledge in self-defense honed through years of on-the-job training. He conducted a training session at which participants assumed the roles of suspect and law enforcement officer, and he used examples from work to demonstrate techniques for disrupting the OODA loop. Indeed, the slap may well have been an ill-advised attempt to further demonstrate the concept. Regardless, Ramsey's conduct brought discredit to the Department by casting doubt on the judgment and professionalism of its officers amongst members of another law enforcement agency and necessitating a federal investigation. These circumstances are more than enough to support the Board's finding that Ramsey's failure of good behavior was rationally related to his job as a correctional officer. (See, e.g., *Anderson v. State Personnel Bd.* (1987) 194 Cal.App.3d 761, 771-772 [substantial evidence supported determination that CHP officer's habitual nudity within view of

---

[4] The record is inconsistent as to who was playing what role on this occasion.

15

neighbors was reasonably related to his employment and "brought embarrassment and discredit to the law enforcement agency he served"].)

        2.      *Sufficiency of Evidence of Ramsey's Intent to Slap J.L.*

Ramsey next challenges the sufficiency of the evidence supporting the Board's finding he intentionally slapped J.L. Ramsey emphasizes that E.H. did not see the moment of contact with J.L., and neither characterized the slap as intentional until after the training session. He also emphasizes that there was evidence from which the Board could have inferred the slap was accidental. These arguments are unavailing.

Again, we independently review whether substantial evidence supports the Board's findings. (*Telish, supra*, 234 Cal.App.4th at p. 1487.) Substantial evidence includes " ' "[c]ircumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 676.) "Even where contradicted by direct testimony, the finder of fact is entitled to accept persuasive circumstantial evidence to the contrary." (*Norris v. State Personnel Bd.* (1985) 174 Cal.App.3d 393, 398-399.)

Witnesses offered markedly different accounts of the training incident. Ramsey acknowledged making contact with J.L.'s genital area, but said the contact occurred during a bear hug escape and amounted to a "light tap" with the pinky side of his left hand. By contrast, J.L. testified that Ramsey delivered a "hard" and "stinging" blow to her genital area with an open palm during a ground escape scenario. When J.L. stood and turned to face Ramsey, he said nothing but smiled or smirked at her.

E.H.'s testimony tended to corroborate J.L.'s. Although E.H. missed the moment of contact, she heard J.L. cry out during the ground escape scenario and saw Ramsey's hand "between her legs somewhere." Rather than apologize, E.H. heard Ramsey say, "[I]t's a sensitive area no matter what gender you are." E.H. further testified that she had many years of self-defense training and had never known anyone to touch another person's genital area on purpose.

16

As previously discussed, the ALJ evaluated the credibility of each witness under Evidence Code section 780, and found J.L. and E.H. testified credibly and consistently, while Ramsey did not. The Board adopted the ALJ's credibility determinations, and we do not second-guess them. (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1492.) The testimony of J.L. and E.H. constitutes substantial circumstantial evidence that the slap was intentional. (*Gubser v. Department of Employment* (1969) 271 Cal.App.2d 240, 243 [circumstantial evidence may be used to prove intent].) Drawing on their testimony, the ALJ could reasonably infer that someone intending to deliver a painful blow to a woman's genital area would be likely to use an open palm, rather than the pinkie side of his hand. The ALJ could also reasonably infer that someone who accidentally struck another person's genital area would be likely to apologize, rather than smile or smirk. The ALJ could also reasonably infer that someone who accidentally struck another person's genital area would be unlikely to unapologetically observe that, "[I]t's a sensitive area no matter what gender you are." Thus, substantial evidence supports the finding that the slap was intentional.

Ramsey observes that there was also evidence from which the ALJ could have drawn the opposite conclusion. He points to his own statements to investigators, in which he insisted as much, and the nature of the training, which involved grappling at close quarters. As we have suggested, the ALJ as the trier of fact was entitled to believe some or none of Ramsey's testimony. (See Evid. Code, § 780.) As a court of review, we neither reweigh the evidence nor reevaluate witnesses' credibility; rather, we examine "all relevant evidence in the entire record, considering both the evidence that supports the Board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence." (*Telish, supra*, 234 Cal.App.4th at p. 1487.) Here, as we have said, substantial evidence supports the finding that the slap was intentional. That other evidence might support another finding does not mean the ALJ's finding of intent lacks substantial evidence.

17

Ramsey also observes that E.H. and J.L. did not characterize the slap as intentional at the time of the training session. But neither had reason to narrate events as they unfolded. To the contrary, they each had reason to keep their counsel. J.L. testified her immediate reaction to the slap was confusion, as nothing similar had ever happened to her before. E.H. similarly testified that she had never experienced such a thing in many years of self-defense training. From this testimony, the ALJ could have reasonably inferred that Ramsey's conduct was so shocking and unexpected that J.L. and E.H. were unable to make sense of it in the moment. That does not mean that their subsequent understanding of events was not believable, or the ALJ could not have reasonably relied upon it. Substantial evidence supports the ALJ's intent finding.

### 3. *Sufficiency of Evidence of Dishonesty*

Ramsey next challenges the sufficiency of the evidence supporting the findings of dishonesty. The ALJ found Ramsey acted dishonestly by denying military service on his employment application and by telling investigators that J.L. reacted to the slap by giggling. Both dishonesty findings are supported by substantial evidence.

"Dishonesty is incompatible with the public trust." (*Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, 231.) "By its enactment of section 19572, subdivision (f), the Legislature indicated a strong public policy against having dishonest employees in the state service." (*Gee v. California State Personnel Board* (1970) 5 Cal.App.3d 713, 719.) A finding of dishonesty generally requires a showing of an intentional misrepresentation of known facts, or a willful omission of pertinent facts, or a disposition to lie, cheat, or defraud. (See generally *id.* at pp. 718-719; see also *Paulino v. Civil Service Commission* (1985) 175 Cal.App.3d 962, 972.)

Ramsey argues there was insufficient evidence to support the finding that he acted dishonestly by denying military service on his employment application. He points to the Army's website, which supposedly contains information to support an argument that the question whether he "served" in the Army could have been interpreted in various ways,

18

including one that would made his response truthful. That information does not appear to have been part of the administrative record, and the trial court properly refused to consider it. (See *Toyota of Visalia, Inc. v. New Motor Vehicle Bd.* (1987) 188 Cal.App.3d 872, 881 ["The general rule is that a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency"].) Ramsey does not challenge the trial court's ruling, and we decline to revisit it. Regardless, substantial evidence supports the ALJ's dishonesty finding. Ramsey held himself out as having served in the Army and admitted having denied military service because he was embarrassed by the circumstances surrounding his medical discharge. He also admitted the denial was untruthful. The ALJ found Ramsey's subsequent explanation—that his commanding officer instructed him to deny military service— implausible, and we will not disturb that finding.

Ramsey also argues there was insufficient evidence to support the finding that he acted dishonestly by telling investigators that J.L. "giggled" in response to the slap. Ramsey emphasizes that J.L. and E.H. both testified that J.L. laughed after the slap. He argues his statement to investigators could not have been false, because laughing and giggling are similar responses. We are not persuaded. Again, Ramsey told investigators he accidentally delivered a "slight tap" or "light tap" to J.L.'s genital area. According to Ramsey, J.L. responded by saying, "My vagina, my vagina, while jumping up and down." Later in the interview, Ramsey said, "She was giggling with a smile on her face." Still later, he said, "she was jumping up and down, giggling, my vagina, my vagina."

But J.L. and E.H. painted a different picture. J.L. testified that Ramsey made contact with her genital area, and she stood up. She said, "my vagina." She then turned and looked at Ramsey. Ramsey smirked at J.L., an uncomfortable silence followed, and J.L. laughed to break the silence. E.H., for her part, testified she heard J.L. give "a surprised laugh" after standing up. Together, their testimony supports an inference that J.L. reacted to the slap with shock and discomfort, rather than amusement. That

19

inference, in turn, supports a finding that Ramsey acted dishonestly in describing J.L. as "jumping up and down, giggling" in the investigative interview.  Substantial evidence thus supports both dishonesty findings.

D.      *Whether the Penalty of Termination was an Abuse of Discretion*

Finally, Ramsey's opening brief argues the trial court erred in failing to independently review the Board's decision to terminate his employment.  Here again, Ramsey opens with the wrong standard of review.  (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218 ["In reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court"].)  Ramsey tries to course-correct in the reply brief arguing the Board exceeded the bounds of reason in imposing the penalty of termination.  But that argument assumes the success of each of the previously discussed challenges to the sufficiency of the evidence.  Thus, Ramsey argues the Board abused its discretion in imposing the penalty of termination because there was insufficient evidence he intentionally slapped J.L during the training session and acted dishonestly by mischaracterizing J.L.'s reaction to the slap and denying military service on his employment application.  Having rejected Ramsey's challenges to the sufficiency of the evidence supporting the Board's culpability findings, we likewise reject his derivative challenge to the Board's choice of penalty.  (*Ibid.* ["Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed"].)

## III.  DISPOSITION

The judgment is affirmed.

/S/
RENNER, J.

We concur:

/S/
EARL, P. J.

/S/
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21